## VALIDITY OF AN AWARD BY ARBITRATORS.

Common Pleas Court of Cuyahoga County.

### B. W. ERNST v. WILLIAM MCDOWELL ET AL.

Decided, February 5, 1911.

*Arbitration—Objection to an Arbitrator on the Ground of Partiality— Irregularity in the Hearing of Testimony—Waiver—Burden of Proof as to the Manner in which the Arbitration was Conducted —When an Agreement to Arbitrate May be Revoked—What Constitutes a Revocation.*

1. Where one of the parties to an arbitration objects to the finding on the ground that the arbitrator denied his request that witness be called as to certain matters in dispute, the burden is upon him to establish the fact of such refusal.
2. The burden is also upon the objecting party to show that when he gave notice that he "wouldn't stand for any such doings" he meant to revoke his agreement to submit to an arbitration, and not that he intended to merely declare that he would not stand by the award.
3. The arbitrators constitute the tribunal in the matter of an arbitration and a revocation of the agreement to arbitrate is not effective unless it is delivered to all the arbitrators.
4. Where the agreement to arbitrate does not specify that the finding must be in writing, the award must be considered as made at the time the arbitrators agreed as to what it should be, notwithstanding one of the arbitrators subsequently reduced the finding to writing, and the revocation of the agreement to arbitrate is too late when notice thereof is not given until after the arbitrators have come to an agreement and the objecting party has become aware what finding will be made.

*Ford, Synder & Tilden,* for plaintiff.
*Herrick & Hopkins* and *D. C. Parker,* contra.

COLLISTER, J.

Plaintiff avers in his petition that there was some misunderstanding and disagreement between him and the defendant, William McDowell, concerning the disposition of funds in connection with certain sewer work done for the village of Upper Sandusky; and that, because of this misunderstanding and disagreement, the plaintiff and the defendant, William McDowell,

agreed to submit said controversy to three arbitrators, and abide by the award of said arbitrators; and this agreement was made on the 6th day of April, 1909, in writing, of which the following is a copy:

"CLEVELAND, OHIO, April 6, 1909.

"We, William McDowell and B. W. Ernst, both jointly and separately hereby agree that, in view of misunderstanding and disagreement in regard to a certain contract for work done at Upper Sandusky, said contract for work having been done by B. W. Ernst, who did not complete the same, and William Mc-Dowell doing the unfinished portion of the work for B. W. Ernst, and completing said work in accordance with the plans and specifications of the engineer in charge representing the village of Upper Sandusky, for whom the work was being done. Now, there being a misunderstanding and disagreement in regard to the amount collected by Mr. McDowell as due him for the completion of said work, we hereby agree to leave this disputed amount to the following named gentlemen: E. W. Sloan, A. F. Helm and H. C. Bradley, as arbitrators; and also agree to abide by the decision rendered in regard to the settlement of all the questions in dispute; this finding of the arbitrators to be final, and no further action to be taken by either of us pertaining to this question in dispute. Witness our hands and signatures the 6th day of April, 1909. (Signed) B. W. Ernst. (Signed) William McDowell. Witnesses, E. W. Sloan, A. F. Helm and H. C. Bradley."

That, in pursuance of said agreement, the three arbitrators met, and, after full consideration of all the evidence presented to said arbitrators by both the plaintiff and the defendant, William McDowell, the arbitrators made their award on the 7th day of April, 1909, of which the following is a copy:

"APRIL 7, 1909.

"Messrs. B. W. Ernst and William McDowell. Gentlemen:

"Your committee, appointed by you and mutually agreed upon to arbitrate the disposition and determine the compensation to be received by each in the sewer contract of Upper Sandusky, Ohio, which was started by B. W. Ernst, and completed by Mr. William McDowell, decides as follows: Mr. B. W. Ernst is to receive all the money now on deposit at the First National Bank of Upper Sandusky, approximately $2,205, as his share of the proceeds, the same to be paid within ten days. Mr. William McDowell is to complete any work now unfinished upon the contract within the specified time allowed, and is to receive the

one thousand dollars now held by the village of Upper Sandusky as guarantee for the completion of the contract, in accordance with the specifications, as his share of the proceeds. Your committee has carefully considered the evidence presented, and it is their unanimous opinion that this decision does justice to both parties. Respectfully submitted, A. F. Helm, E. W. Sloan, H. C. Bradley.''

Plaintiff says that a copy of said award was served upon the defendant, William McDowell, on or about the 7th day of April, 1909, but that the said defendant refused to abide by and perform said award, and still refuses to abide by and perform said award, though the plaintiff has often requested him to do so. .

Plaintiff, for a second cause of action, asks judgment against McDowell in the sum of $2,205, and for an order of injunction enjoining the bank from paying to McDowell any money on deposit from said work, and enjoining McDowell from drawing any such money, and for such other relief as is just, proper and equitable.

In his amended answer McDowell avers he entered into an arbitration agreement upon the representations of each of said arbitrators that each could make an impartial finding; denies that the copy of said agreement contained in the petition is a correct copy of the papers he signed, and says that if it is a correct copy, the said paper does not contain the agreement actually made between the plaintiff and this defendant; avers that each of the parties made a statement of his claim, and this defendant requested said arbitrators to call in witnesses who could give testimony on disputed points, but the arbitrators refused to call in any witnesses. That on the evening of the day after the sitting held by said arbitrators this defendant learned for the first time that said E. W. Sloan was an intimate personal and business associate of the plaintiff, and was entirely under the control and influence of the plaintiff, and was, therefore, so biased as to be entirely unfit to act as an arbitrator in said matters; and the plaintiff and said Sloan concealed said facts from this defendant for the fraudulent purpose of inducing this defendant to enter into said agreement of arbitration; and defendant, by reason of said concealment, was induced to enter into said agreement of arbitration. Immediately upon the learn-

ing of said facts, this defendant notified each of said arbitrators of the facts that he had just discovered as to the relationship between said Sloan and plaintiff, and notified each of said arbitrators that he rescinded said agreement and arbitration, and refused to be further bound by any action on the part of said arbitrators; but the said arbitrators thereafter, without further joint action, or consultation with reference thereto, persisted at different times and places in signing the alleged award.   The defendant denies that the said arbitrators gave any consideration whatever to any evidence pertaining to said controversy, but says on the contrary that they refused to hear any evidence which this defendant requested them to hear; and prays that the restraining order be dissolved, and that the contract of arbitration and the alleged award be set aside, and for such other relief as is proper.

A reply was filed, which denies all averments of the answer concerning the arbitration and award features thereof.

The issue submitted to this court is as to the validity of the award.   In the pleadings, the questions at issue are:

1.   Fraud of the arbitrators in inducing defendant to believe that each of them was impartial and disinterested, when in fact the reverse was the case.

2.   The copy of the agreement of arbitration set up in the petition is not a true copy of the agreement defendant signed.

3.   If it is a correct copy, it does not contain the agreement actually made between plaintiff and this defendant.

4.   That defendant requested the arbitrators to call in witnesses who could give testimony on disputed points, and the arbitrators refused so to do.

5.   Irregularity in hearing testimony from plaintiff in the absence of defendant, though defendant was ready to go into the room where the arbitrators were sitting.

6.   The bias of E. W. Sloan in favor of the plaintiff by reason of his being an intimate personal and business associate of the plaintiff, and entirely under the control and influence of the plaintiff, which facts plaintiff concealed from defendant for the fraudulent purpose of inducing defendant to enter into said agreement of arbitration.   That defendant was, by reason of said agreement, induced to enter into said agreement of arbitra-

tion; and that defendant first learned of said fraud on the evening of the first day after the sitting of said arbitrators.

7. That the agreement to arbitrate was by the defendant rescinded.

On the hearing, the defendant made no claim as to the second and third questions at issue; and, as to those, the court finds for the plaintiff.

On the fourth question at issue, there was proof offered. McDowell's testimony on the subject was, according to my notes and recollection, as follows:

"Bradley said the agreement should be in writing. I was willing. It was drawn up and I signed it. Ernst first spoke. Ernst looked at some papers. I said, 'the question is, to whom does that money belong?' Ernst said a lot of stuff. I said, 'No use to tell lies.' Let the people come from Sandusky and tell.' Things then quieted down."

That is all the testimony on the subject from the defendant. I do not recall that Mr. Bradley, Mr. Sloan or the plaintiff testified on the subject. Mr. Helm, in his first deposition in chief, testified as follows, from page 9:

"Q. I don't mean other persons to act as arbitrators, but did Mr. McDowell request you to call outsiders, or other people, to give testimony to support his case? A. No, sir."

On cross-examination Mr. Helm testified as follows, pages 25, 26 and 27:

"Q. Mr. Helm, do you remember, at that hearing, that Mr. Ernst and Mr. McDowell at any time, or during that afternoon at Bradley's office, Mr. Ernst and Mr. McDowell at any time got into any loud words or trouble? A. Yes, they had a couple of loud words. He accused Mr. Ernst that he didn't attend to business, he went shooting at a tin can, or something like that.

"Q. I didn't ask you what the loud words were, but simply if there were any. Now, don't you remember that at that time Mr. McDowell said something that this was no time to be quareling, after a few loud words Mr. McDowell said this was no time to be quarreling, that it was simply a business proposition before you gentlemen; don't you remember that? A. No, I do not.

"Q. Don't you remember of McDowell saying, 'Why, this is not a time for quarreling. The thing to do is to get some witnesses from Upper Sandusky that know about this thing, and for you to hear them?' A. No, sir.

Ernst v. McDowell.                    [Vol. 11 (N.S.)·

"Q.   Don't you remember, Mr. Helm, at that time, when words were getting a little bit loud and they were differing with each other, of McDowell saying this: 'There is no use Ernst telling lies about this thing.   The way to do is to get some witnesses here from Upper Sandusky that know all about it?'   A. I don't recollect.   Mr. Ernst couldn't tell no lies.   Mr. Ernst had his full papers there to show everything we were arbitrating.   He went by his papers.   Mr. McDowell didn't have nothing there. Mr. Ernst had a bank book, with a bank account in it.

"Q.   McDowell didn't have anything there?   A. No, sir.

"Q.   Don't you remember hearing McDowell say that you should have witnesses from Upper Sandusky?   A. I do not, and I don't believe it.

"Q.   And that the way to do was to get witnesses from Upper Sandusky that knew about it?   A. No, sir.   I don't believe there was a word said.

"Q.   There might have been?   Do you think you heard every word that was said there?   A. I did, if I haven't forgot it."

I take it that the burden to establish that issue would be on the defendant.   In the state of the proof aforesaid, it must be held that the defendant has not maintained such burden, and the court finds for the plaintiff on that contention.

On the fifth question at issue, I am satisfied that if any irregularity was shown in the proof, such irregularity was waived by the parties by their conduct at and during and subsequent to the hearing, and find for the plaintiff on that contention.

The first and sixth questions at issue should be and are considered together.   I have carefully considered all the testimony on the questions, and am satisfied the finding should be for the plaintiff on these contentions.

This leaves the seventh question at issue to be determined. The determination of this question has given the court much concern, and I am by no means certain that I have arrived at the proper solution of it.   Counsel have been very diligent in searching the books for precedent that might serve to blaze the way. The court has spent much time with the same end in view, but with all the research the land-marks are few and far between and very indistinct.

In brief, the facts on this branch of the case are as follows: H. F. Bradley, whose recollection is very indistinct, says:

"All three of us (meaning the arbitrators) prepared the award. I suggested that Sloan draw it up, as he had a stenographer,

and we would sign it, which we did two or three days later.   We had only one meeting.   Our decision was made then.   And Sloan was delegated to put our finding in writing.   ·We agreed upon our award that afternoon.   We were not all together when the award was signed.   Before the award was signed I had a telephone call from McDowell, and afterwards, and after the award was signed, received a letter from McDowell.   My memory is indistinct about it, but· my recollection is that something was said about Sloan being interested with Ernst, and he, McDowell, would not stand by the award.''

Bradley's memory does not serve him correctly on this point, because the other testimony shows that the letter was sent before the award was signed.   Mr. Helm says, in his first deposition, on page 7:

''Q.   And what was done after you had Mr. Ernst go out and heard Mr. McDowell's side?   A.   Then we sent them both out.

''Q.   Then what was done?   A.   Then we went all through the trouble they had, and Mr. Bradley and Mr. Sloan and me, we weighed all those points carefully, and we came to the conclusion to award Mr. Ernst the proceeds in the bank, I forgot how much it was, twenty some odd hundred dollars or something, and give Mr. McDowell the one thousand dollars held back by the city of Sandusky as a guaranty.

''Q.   Now then, Mr. Helm, after the arbitration committee had arrived at its conclusion, what was done further?   A.   Well, there was that paper drawn· up.

''Q.   Was that drawn up at the time of this meeting, or later?   A.   I don't know if it was drawn up in typewriting or not, but it was drawn up.''

Page 11:

''Q.   Now then, after the meeting of the board of arbitration was over and you had arrived at your decision; did you sign the award at that time, or later?   A.   No, sir, signed it later.

''Q.   How much later?   A.   Well, it must have been two or three days, or something like that.   I am not very certain, but I know it was a couple of days after that.

''Q.   Now then, as you left Bradley's office, did you have a conversation with Mr. McDowell?   A.   Yes, sir.

''Q.   And where was that?   A.   I think it was right there in the Arcade Building, or on the sidewalk.

''Q.   And what was that conversation?   A.   I told Mr. McDowell what we agreed upon, and I told Mr. McDowell that I

took his part and fought hard to get him the thousand dollars, otherwise he wouldn't have got only a salary.

"Q. Did you tell him at that time what the board of arbitration had decided? A. Yes, sir.

"Q. And told him then the substance of the award? A. Yes, sir.

"Q. And did he have anything to say at that time? A. No, sir.

"Q. Now, then, what was the next that you heard or did concerning this matter? A. Well, this was in the afternoon. The next was in the evening. McDowell called me up from the office and told me, over the telephone, that he had found out that Mr. Sloan and Mr. Ernst were in cahoots, or were sticking together; that Mr. Sloan was helping Ernst out on financial matters, and his mail in Sandusky was all sent to the Davis Laundry Company. I also called up Mr. Bradley, and Mr. Bradley says if that is the case he won't sign the agreement.

"Q. You mean the award? A. Won't sign the award.

"Q. Didn't you make a request of him to give you in writing a statement of the particulars in which Ernst was interested financially with Sloan? A. Yes, sir.

"Q. Did he do that? A. Yes, he did it."

On page 18:

"Q. That evening when McDowell called you up and told you about this connection of Sloan, he said to you that he wouldn't stand for any award there, didn't he? A. I think he said that I was a fool, that he wouldn't stand by it. But I told him it was too late."

On page 21:

"Q. After this talk with McDowell over the telephone it was several days before you signed what they call the award, this paper, plaintiff's exhibit 2? A. Yes, sir, I think that must have been two or three days afterwards.

"Q. So if that paper that I have just referred to is in fact dated the next day after the contract, then it must have been dated before it was in fact signed; is that right? A. Well, that would be guess work. I couldn't say that."

On page 30:

"Q. At the time of this conversation just out of Mr. Bradley's office, after the arbitration was over, do you recall anything further that was said by you or Mr. McDowell? A. Mr. McDowell said he wanted all the money or none.

"Q.   And what did you say to him then?   A. I think I said.
he ought to be satisfied with what he got.

"Q.   It was at that time that you told him what the award
was?   A. Yes, sir."

Mr. Helm says in his second deposition, on page 2:

"Q.   Mr. Helm, in your deposition before, you recall some-
thing being said in reference to Mr. McDowell having a telephone
talk with you the evening following the hearing in Mr. Bradley's
office of the arbitrators?   A. Yes, I think it was the very same
evening.

"Q.   What was that talk?   A. Well, Mr. McDowell called
me up and he says that he found out that Mr. Sloan was finan-
cially interested with Mr. Ernst, and, furthermore, that Mr.
Ernst's mail was sent in care of—I don't know, was it the Davis
Laundry Company, but it was sent in care of—outside of Mr.
Sloan.   That was the conversation that was over the phone.   And
then I told him to write me a letter to that effect.

"Q.   And do you know whether he did write such a letter?
A. I think he did; yes, sir.

"Q.   And did you receive such a letter?   A. I did; yes, sir."
On page 4:

"Q.   Now, when did you receive that letter?   A. I ain't very
sure if it was the first or the second day after the meeting up
in Bradley's office.

"Q.   Well, when was it in reference to the time you signed
a paper that was called the award, before or after?   A. I think
it must have been two or three days after.

"Q.   (By Mr. Roberts)   What?   A. I think it must have
been two or three days after I received that letter.

"Q.   (By Mr. Herrick)   Before you signed the award?   A.
Yes."

On page 5:

"Q.   Mr. Helm, what was in this letter, the substance of it,
as best you can remember?   A. Why, just the same as I told
Mr. Herrick, there was in there that he mentioned Mr. Sloan was
interested with Mr. Ernst and that Mr. Sloan received some of
Ernst's mail.

"Q.   Anything else in it, as best you can remember?   A.
Not that I can remember.

"Q.   Was there anything in that letter about McDowell not
being willing to abide by the decision of the arbitrators?   A.
Not that I recollect.   Might have been, but I couldn't swear
to it."

On page 6:

"Q.  Was there anything in there about revoking—either of the arbitrators—to make the award?  A. No, sir.

"Q.  What is that?  A. No, not to my knowledge.

"Q.  You don't remember exactly what was in the letter, Mr. Helm, do you?  A. No, all I remember, Mr. Herrick, is that he told me that he understood or he heard that Mr. Sloan was interested with Mr. Ernst, and that mail came to Ernst—was sent in care of the Davis Laundry Company.

"Q.  Mr. Helm, don't you remember there being something in the letter about Mr. McDowell objecting to an award by Mr. Sloan because of his being prejudiced?  A. I don't remember there was anything in that letter he sent me.

"Q.  Well, there might have been something?  A. If there was, I don't remember.

"Q.  But it did tell you that he claimed Mr. Sloan was interested?  A. Yes, sir.

"Q.  And prejudiced?  A. Yes.

"Q.  And you told him, did you not, when you talked with him over the phone that if that was the case you wouldn't sign the award?  A. I would investigate first.

"Q.  Yes, if that was so, you wouldn't sign the award?  A. Yes, sir.

"Q.  Now, you say that you asked Mr. McDowell over the phone to write you this letter and tell you in the letter what he had told you over the phone?  A. Yes, sir.

"Q.  Did you suggest to Mr. McDowell the writing of that letter, or did he suggest it to you?  A. I done it.

"Q.  The decision made by the arbitrators was made, was it not, that very afternoon that the meeting was held?  A. Yes, sir.

"Q.  And the arbitrators never had any further discussion about the matter, did they, all together?  A. No, not afterwards.

"Q.  Did you tell Mr. McDowell, when you left Mr. Bradley's office that afternoon, after the arbitrators had made their decision, what the decision was?  A. Yes, sir.

"Q.  Did you tell him the exact terms of the decision, that is, how much he was to get and how much Mr. Ernst was to get?  A. Yes, sir.

"Q.  Was that before he had the telephone conversation with you?  A. Yes, sir.

"Q.  And before you received the letter from him?  A. Yes, sir."

Mr. McDowell says, in substance:

"On the afternoon of the day of the meeting of the arbi-

trators, about 6:30 P. M., Helm informed me what the award would be.   After I got home I learned about Sloan's relations with Ernst.   I telephoned Helm and Bradley, and told them that 'I understand Sloan is a friend of Ernst, and financially interested with him, and I will not stand by such a man as that.' Helm said, 'Write a letter to that effect.'   I sent one to Helm and Bradley.''   (The letters to Bradley and Helm could not be produced.)

Mr. McDowell testified that the contents of this letter were in substance as follows:   That it called attention to the fact that Sloan was a friend of Ernst and financially interested with him, "and is not fair man for arbitrator, and I won't stand by any such doings.''

There is no testimony, that either by word of mouth or telephone or by letter, that McDowell had any communication at all with the third arbitrator, Mr. Sloan.

In the case of *The Lessee of Hunt* v. *Guilford*, reported in 4 O., 311, it appears from the decision of the court, on page 316, that the trial court charged the jury as follows:   "That the law not only allowed parties to settle amicably their controversies, and in this way, but favored such settlements; and when they so appeared slight proof should not destroy them.   It ought to be strong and convincing.''   The Supreme Court affirmed the lower court, and thereby must have approved the charge of the lower court.

In the case of *State* v. *Jackson*, 36 O. S., page 283, the court, in its opinion, says:

"Arbitration is a method which has long existed at common law for the settlement of disputes and controversies.   No particular form is required in the proceeding.   Neither the arbitrators nor the witnesses are required to be sworn, though the parties may stipulate that such oaths should be administered. The submission may be revoked by either party at any time before the award is actually delivered.''   *   *   *

This, in my opinion, is *obiter dictum*.

See, also, 1 O. S., 463.

In *Brown* v. *Welcker & Yost*, 41 Tenn., page 200, the court, in its opinion, uses this language:   This action was for the recovery from a stake-holder of a sum of money deposited as a forfeiture against such a party to an arbitration agreement

as should fail to execute the contract as it would be found by the arbitrators. The arbitrators failed and refused to act at all. In the course of the opinion the court says:

"The error of the charge lies in the assumption that the mere expression of a determination, on the part of Brown, 'not to stand to the agreement,' put an end to the contract, or was equivalent to a revocation of the authority of the arbitrators. Such was not the legal effect. Brown had positively committed himself to the decision of the arbitrators, and could not escape from the conclusive effect of their decision, if fairly made. True, he might have revoked the authority before it was executed by the arbitrators, that is, *before they acted under it;* but if this were not done, neither the power, nor the duty of the arbitrators to make an award could be affected in any way by the declarations of Brown, that he would not abide his agreement. Not having revoked their authority, he had no power over them to prevent their execution of it, and such declarations are simply nugatory. The award, if fully made, would have been just as operative and binding on Brown as if no such declaration had been made."

So much of the opinion as has been quoted is, in my opinion, *obiter dictum,* as the opinion quoted in the case of *State* v. *Jackson.* These opinions are of no value as opinions of a court but are of value only as to the views, respectively, of different judges. One judge says the arbitration agreement may be revoked at any time before the award *is actually delivered.* The other says a party might have revoked the authority before it was executed by the arbitrators, that is, *before they acted under it.* The opinion of the Tennessee court is to the effect, that one of the parties, after the arbitration acted under the settlement agreement, could not avoid the award by his declaration that he would not abide his agreement. Neither of these opinions is of controlling force in coming to a conclusion on the matters here in controvesy.

The case of *J. R. & J. P. Buckwalter* v. *Russell,* reported in 119 Pa., 495, is in point on one of the questions that must be decided in this case. The court, in its opinion, says (p. 501):

"But it is alleged that the submission was revoked by Buckwalter before the corrected award was signed, and that it was for that reason a nullity. The facts appear to be that the award was really made on May 24th, 1886, after the parties

were heard; that it was written out and signed, and that the parties had knowledge both of the fact that the award was made and of its character. The subsequent delay was not for deliberation upon the character of the award, but for the correction of some supposed defects of form. The meeting of the arbitrators in November was not for the purpose of re-hearing or re-opening the case, but for the preparation of a better form for their award, and to hear Buckwalter's claim to an additional credit. A notice of revocation, served at this time, came too late. In *Mitchell* v. *Newman,* 4 Penny., 443, the revocation was served after the case had been heard, but before the award was announced, and it was held to be too late. In *McGheehen* v. *Duffield,* 5 Pa., 407-500, an award had been sent back for correction by the court, and the notice of revocation was served before the corrected award was made, but this also was held too late. In *Shisler* v. *Keavy,* 75 Pa., 79, the notice of revocation was served on the same day on which the award was made, but whether the award or the revocation was first in time, did not appear. The plaintiff sought to show that the revocation was first, but this court declined to look into the depositions. The rule in Pennsylvania seems to be that a notice of revocation, to be effective, must be served before an award has been agreed upon. While the case is in progress either party may revoke, but where the trial has concluded and the arbitrators have agreed substantially upon their award, it is too late. The arbitrators have then discharged the duty put upon them by the parties, and nothing remains but to reduce their conclusion to form. A party ought not to be permitted to take the chances of a trial, and, when he finds an award is to be made against him, revoke the power of the arbitrators. The fact that the award has not been reduced to writing is immaterial. Like a verdict, it may be put in form after its character has been decided upon.

"The revocation in this case was too late. After an award was made on May 24th, the power to revoke was gone. There was no general reopening of the case after that date, and Buckwalter was made aware of the character of the award soon after. The allowance of a credit to him at his request by the arbitrators, made the award more favorable to him, but it gave him no right or revocation. It did not change the character of their finding or of the basis on which it had been made, but adhering to both it gave him an additional credit. The ruling of the learned judge of the court below was right. Judgment affirmed."

The court in the Buckwalter case, *supra,* cites the case of *Mitchell* v. *Newman,* 4 Pennepacker, page 443, in support of its opinion. The opinion in the Mitchell case is as follows (p. 448):

"This agreement of submission contains something more than a mere submission. It further stipulates that the defendant in error should give to the plaintiff in error all the books and papers of the firm, and that the latter should become the liquidating partner, with full power to dispose of its assets and pay its indebtedness therewith. This was a sufficient consideration to make the submission irrevocable when made. An attempted revocation just as the award is about to be announced, and when there is persuasive evidence that the party had substantial knowledge of the conclusion at which the referees had arrived, is not entitled to much favor. It can not be asserted except under a clear claim of right. Such right did not exist in this case."

In the case of Marsh v. Packer, 20 Vt., 198, the facts were: There was no provision in the submission that the award should be in writing. On August 21st, 1846, a hearing was had, and the arbitrators decided upon their award, and this award was seen after published to the parties by parol, merely the arbitrators and the parties being all present. On September 7th, 1846, and after the award was published, the plaintiff signed a written revocation of the submission, and gave notice thereof to the arbitrators. Afterward the arbitrators reduced their award to writing, and endorsed it on the back of the submission. On these facts the court decided:

"We feel bound to hold, that the parol award in the case was sufficient; and that, the authority of the arbitrators having been executed by its publication, the plaintiff's revocation is too late."

In the Marsh case the award was published to the parties by the arbitrators, the parties being present when the award was announced. Afterward, and before the award was reduced to writing, the plaintiff signed a written revocation and gave notice of it to the arbitrators.

The facts in the case differ in one essential particular from the case at bar. In our case the award was not published in the presence of all the arbitrators and parties before the defendant delivered the letter to two of the arbitrators, by which delivery of said letter he claims he revoked the authority of the arbitrators. I do not feel that the Marsh case, therefore, is very helpful in deciding our case.

In the case of *Fook* v. *Lawson,* Superior Court of Sussex County, Delaware, reported in the Atlantic Reporter, the number of which now escapes me, the court charged the jury as follows:

"But another ground of defense to this suit has been urged in behalf of Dr. Fook, that is, that he revoked his agreement to submit his controvery with Lawson to said arbitrators, and consequently their authority to make a valid and binding award before their alleged award was made. If you find this to be the case, after careful consideration of all the evidence before you, then the arbitrators' award would be invalid, and Lawson could not recover against Fook in this action. The law permits either of the parties to a submission of arbitration to revoke, without the consent of the other, the agreement of such submission before the award authorized thereby has been made. But a jury should be clearly convinced by competent and satisfactory evidence that there has been a plain, positive and absolute revocation by one of the parties before they can find the contested award unauthorized and invalid."

(The facts, if there were any, in the case which permitted, authorized or compelled a charge on the subject of revocation do not appear in the report of the case.)

I am satisfied that no particular form of words is necessary to constitute a revocation; if a fair construction of the language is, that the party intended a revocation, that construction should be given the paper.

The question to be decided may be subdivided thus:

(a)   Did the letter sent by McDowell amount to a revocation?

(b)   When was the award made?

(c)   Was it, if a revocation, effective, not having been delivered to all the arbitrators?

(a)   It would seem to be a fair rule, that the burden should be on the one claiming the revocation to establish such claim. What effect should be given to the language employed by Mr. McDowell? The language of the letter, as testified to by him, is, "It called attention to the fact that Sloan was a friend of Ernst, and was financially interested with him, and is not a fair man for an arbitrator, and I won't stand for such doings." And as testified by others, in substance, "That Sloan is interested with Ernst, and I won't stand by the award."

Now, what was in the mind of McDowell at the time? Bear in mind he was not a lawyer, and not familiar with the intri-

cacies of the law on the subject. He learned the award was against him; that the arbitrators had agreed upon their finding, and nothing was left but to put it in writing. He was not satisfied with the finding. He thinks to himself, "How can I get out of the award?" He goes home and then learns facts from which he infers Sloan was not an impartial arbitrator; and, harboring a desire to get out of paying the award, he telephones and writes as above set forth.

It is a fair construction of the language, viewed in the light of his desires, to say it means, "I will not stand by the award"; and not that he revokes the agreement to arbitrate. It is true that the language could be construed to mean, he not being a lawyer and no technical words being necessary to constitute a revocation, that he intended to rescind that agreement to arbitrate. Yet, as I have said, the burden is on him. I can not find that he has maintained that burden. And as he had no right to refuse to stand by the award after he knew what it was, and the agreement not being rescinded, the contention on this point must be decided in favor of the plaintiff.

(b) Nothing in the agreement required the award to be in writing. The minds of the arbitrators fully met, and they agreed upon their award, and one of their number was delegated to put it in writing to evidence the finding. So I find the award was made before the letters were written.

If this was the only question to be decided, the court would give the subject more thought; but, inasmuch as the decision of subdivision "a" decides the contention, I give counsel the benefit of my thoughts on subdivision "b."

(c) In my opinion, any revocation, to have been binding, must have been delivered to all the arbitrators. The three together constituted the tribunal, and nothing short of three made the tribunal. If McDowell intended to stop the proceedings of the tribunal, notice should have been given to all three of its members. It follows that the finding must be in favor of the plaintiff on this contention. The decree will be for the plaintiff. Counsel can prepare the decree in accordance with the above findings.